## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DANIEL CHERUBIN,

                                Plaintiff,             Civil Action No.: 22-9634

        -against-

CAMELOT COMMUNICATIONS GROUP, INC.,    **COMPLAINT**
DBA CORANET CORPORATION;
JOHN MAIMONE;
TIMOTHY RYAN;
BANK OF AMERICA;                             **JURY TRIAL DEMANDED**
DISCOVERY CHANNEL, DBA DISCOVERY
COMMUNICATIONS;
NBC UNIVERSAL;
ESPN, and
PENS GROVE Department of Education
                                Defendants.

Plaintiff Daniel Cherubin ("Mr. Cherubin" or "Plaintiff") by and through his attorney, Tyrone Blackburn, Esq. ("Mr. Blackburn"), now files this Complaint against Defendants Camelot Communications ("Camelot" or "Defendant Camelot"), John Maimone ("Maimone" or "Defendant Maimone"), Timothy Ryan ("Ryan" of "Mr. Ryan"), Bank of America ("BOA"), Discovery Channel ("Discovery"), NBC Universal ("NBC"), ESPN Pens Grove Department of Education ("Pensgrove") and states as follows:

## NATURE OF ACTION

1. As set forth herein, Defendants were participants in events leading up to and including retaliation, race discrimination, pay discrimination, and constructive discharge of Plaintiff.

2. Plaintiff brings this action for relief according to the Americans with Disabilities Act ("ADA") regarding Disability Discrimination, Retaliation, Intentional Infliction of Emotional Distress, Race Discrimination, Constructive Discharge, NYSHRL, NYCHRL,

NJLAD, NYLL, Negligent Hiring, and the Retention, as well as violations of the Equal Pay Act (State and Federal).

3. The Plaintiff seeks declaratory relief, compensatory damages, punitive damages, liquidated damages, and reasonable attorneys 'fees and costs as remedies for violations of the Plaintiff's rights.

## THE PARTIES

4. Daniel Cherubin (the "Plaintiff"), residing in the State of New Jersey, is an English-speaking, African American male and former employee of Defendant, Camelot Communications Group, Inc. dba Coranet Corporation; Bank of America, Discovery Channel, dba Discovery Digital Media Discovery Communications, ESPN, NBC, and Pens Grove DOE.

5. Camelot Communications Group, Inc. dba Coranet Corporation (hereinafter referred to as "Defendant Coranet") is a New Jersey corporation.

6. Defendant BOA is a North Carolina corporation headquartered at 100 North Tryon Street, Charlotte, NC 28255.

7. Defendant NBC is a New York corporation headquartered at 30 Rockefeller Plaza, New York, NY 10112.

8. Defendant Discovery is a New York corporation headquartered at 230 park avenue, south New York, New York 10003.

9. Defendant ESPN is a Connecticut corporation headquartered at 545 Middle St. Bristol, CT 06010.

10. Defendant Pens Grove is a New Jersey-based government institution.

11. At all times relevant hereto, Defendant Coranet, Defendant NBC, Defendant BOA, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove were and are currently incorporated or entities authorized to do business throughout the States of New Jersey and New York.

12. At all times relevant herein, Defendant Maimone, and Defendant Ryan, are employees of Defendant Coranet, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove, were present and aware of the alleged acts

against Plaintiff and conspired with or aided and abetted the named Defendant Coranet, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove, in its actions against the Plaintiff, and therefore are liable for the injuries suffered.

13. Plaintiff was hired by Defendant Coranet on or about March 15, 2019, as a Technician and later promoted to the position of Lead Technician.

14. From 2019 to his constructive discharge, Plaintiff was recruited and independently hired by Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove to work on projects within their facilities.

15. As a Lead Technician, Plaintiff would work 60 to 70-hour workweeks.  Plaintiff was not paid overtime for the work completed whenever he worked more than 40 hours.



**John Maimone**
**Referred to Plaintiff as a NIGGER**

16. Defendant Maimone is employed by Defendant Coranet, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove.  Defendant Maimone supervised Plaintiff.

**Timothy Ryan**
**Excused Maimone's Use of the Word NIGGER**

17. Defendant Ryan is employed by Defendant Coranet, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove.  Defendant Ryan supervised Plaintiff.

## JURISDICTION AND VENUE

18. The Plaintiff's federal claim arises under 42 U.S.C. § 1981, and this Court has supplemental jurisdiction over the Plaintiff's state-law claims according to 28 U.S.C. § 1367.

19. The venue is appropriately in the Southern District of New York according to 28 U.S.C. §1391(b)(2). A substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

## ADMINISTRATIVE PROCEDURES

20. Plaintiff has filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC has not issued a Final Determination or a notice of the right to sue. All conditions precedent to the filing of the suit have been performed or have occurred.

## FACTUAL BACKGROUND

21. Plaintiff, an English-speaking African American male, was at all times relevant to this Complaint, an employee of Defendant Coranet, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove.

22. During his employment, Plaintiff and similarly situated employees worked at various off-site projects, all entailing a high-paced environment requiring physical movement, carrying heavy equipment, accessing confined areas, and standing for long periods.

23. Defendant Coranet, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove's projects were severely understaffed. Plaintiff and similarly situated employees often worked with half the workforce required to complete the scope of the work: this increased Plaintiff's and other employees' chances of being injured.

## DEFENDANT MAIMONE BEGINS HIS HARASSING
## AND RACIST ATTACKS ON PLAINTIFF

24. On or about April 30, 2019, Plaintiff worked at a south New Jersey job site for five days for Defendant Coranet, who reserved hotel rooms for the employees. Defendant Maimone, the project manager, invited Plaintiff to a coffee break. At approximately

10:56 am, Defendant Maimone and his brother, Saverio Maimone, arrived at the work site to pick up Plaintiff in a van belonging to Defendant Coranet, which had no back seats and was full of loose tools, boxes, and other work equipment.  Defendant Maimone began driving the three men to a nearby Starbucks.

## MAIMONE INSINUATES THAT PLAINTIFF (A HETEROSEXUAL MALE) IS GAY

25. During the drive, Defendant Maimone commented on Plaintiff's attire, saying, "Why are you wearing sweatpants in the middle of April?  Sweatpants are made to make you sweat. I never wear anything other than jeans and boots.  People who wear tapered/fitted sweatpants are gay.  Why else would any man want their pants hugging their balls."

## MAIMONE CALLS PLAINTIFF A NIGGER

26. Plaintiff, feeling uncomfortable, tried to make light of the situation by asking Defendant Maimone why he was so upset about his sweatpants.  At that point, having reached Starbucks, Defendant Maimone exited the van to open the side sliding door for Plaintiff. Plaintiff, upon exiting, said to Defendant Maimone, "relax, do you need a hug or something?  Why are you so upset?" Defendant Maimone responded, "maybe I do need a hug," and gestured to embrace Plaintiff.  Plaintiff obliged, thinking it would resolve the tension, only to have Defendant Maimone add, "Okay, now get off me NIGGER," upon completion.  Defendant Maimone followed up using this racial slur by stating, "I'm just joking bro . . . you know I 'preciate' you."

27. Plaintiff was shocked, upset, and humiliated when Defendant Maimone directed the racial slur at him.  Plaintiff felt extremely uncomfortable and threatened given that he was away from home, had no working vehicle of his own or other means of exiting, and was riding in the back of a van driven by Defendant Maimone.  Plaintiff felt outnumbered, powerless, and degraded.

28. Over the course of the following week, Defendant Maimone unabashedly explained to Plaintiff that his harsh personality, bigotry, and attitude were rooted in his upbringing by racist and abusive parents.

## MAIMONE ATTEMPTS TO PASS PLAINTIFF (AN AFRICAN AMERICAN MAN) OFF AS A SLAVE TO HIS CAUCASIAN COUSIN-IN-LAW

29. In a subsequent incident, again while Plaintiff was confined to the back of a Coranet van, Defendant Maimone, upon opening the sliding door to reveal Plaintiff said to Saverio's wife while pointing at Plaintiff,

> "Hey Joanne, I brought you a gift, someone to clean your yard and cut your grass . . . here he is!"

30. Joanne was visibly appalled at the comment and responded,

> "you are such an ASSHOLE."

31. Plaintiff felt humiliated, embarrassed, and degraded by Defendant Maimone's treating him like a slave to be given as a gift.

32. Over the course of Plaintiff's employment, Defendant Maimone exhibited a continuous, intentional pattern of racial harassment against Plaintiff and similarly situated Coranet, BOA, NBC, Discovery, ESPN, and Pens Grove, employees.  On more occasions than Plaintiff can recall, Defendant Maimone referred to Plaintiff as a "NIGGER."


## MAIMONE DISPLAYED HIS BIGOTRY BY INTENTIONALLY STEALING PLAINTIFF'S TIME[1]

33. Defendant Maimone intentionally entered Plaintiff's time one hour short, per day, for a month, causing Plaintiff to lose 30 hours of paid labor.

34. Defendant Maimone manipulated Plaintiff's hours by denying him access to human resource systems and forbidding him from having a company phone at the time.

35. Both the intentional reduction of Plaintiff's hours and denial of access to Defendant Coranet, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove server were acts of racial harassment by Defendant Maimone against Plaintiff because he was African American.

---

[1] See attached **Exhibit A**: Screenshots of Plaintiffs Stolen Time.

<u>MAIMONE MADE RACIST COMMENTS CONCERNING BLACK PEOPLE PICKING
COTTON</u>

36. While working for Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove, Defendant Maimone regularly made racially derogatory comments to Plaintiff and similarly situated employees.

37. Another example is when Defendant Maimone asked Plaintiff,

   "Why don't black people take aspirin?"

38. According to Defendant Maimone, the answer was,

   "Because they ain't picking cotton out of anything."

<u>RYAN WAS COMPLICIT IN MAIMONES BIGOTRY AND RETALIATED AGAINST
PLAINTIFF FOR COMPLAINING</u>

39. Defendant Ryan supervised Defendant Maimone and was complicit in the discriminatory conduct.  Despite being aware, Defendant Ryan took no action to remediate the ongoing situation.  To the contrary, Defendant Ryan dismissed Plaintiff and insisted that Plaintiff and other coworkers

   "must listen to John [Defendant Maimone], he's the foreman."

40. In another example of complicity, employee McConnell made racially insensitive comments to Plaintiff in front of the upper manager, Thomas Waters ("Waters").  Waters did nothing to correct McConnell's attitudes and comments.

41. Plaintiff feared retaliation should he express his concerns regarding the pattern of intentional, unlawful discrimination he was subjected to.

42. Eventually, Plaintiff's mental and emotional anguish became too much, so he disclosed the discrimination of Defendant Maimone to Defendant Ryan during an in-person meeting.  Defendant Ryan dismissed Plaintiff's complaints, laughing them off and making derogatory remarks about Italian Americans in the process.

43. While working for Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove, Plaintiff raised concerns to his onsite supervisors concerning the bigotry (being called a nigger) he suffered at the hands of Defendant Maimone.

44. Plaintiff's concerns were brushed off, and Plaintiff suffered severe acts of retaliation as a result.

THE FOLLOWING IS A TRANSCRIPT OF THE RECORDED MEETING WHERE
PLAINTIFF COMPLAINS TO RYAN ABOUT MAIMONE CALLING HIM A NIGGER

**Plaintiff**: He knows.  He knows.  He's been trying to get on this.

**Defendant Ryan:** Anything else?  Do the 60, he did 1 through 90.

**Plaintiff:** I mean, that's just about it.

**Defendant Ryan:** You can always call me if you have a question or a problem with these guys.

**Plaintiff:** Yes, but you got your--

**Defendant Ryan:** You don't want to make a big fuss.  Listen, John does a lot for me.  He's my lead.

**Plaintiff:** I get that.

**Defendant Ryan:** I'm not going to say, go back to, "Oh, Dan said this, Dan said that." That's not me.  I'm going to try to make it work, whatever it is.  If you have a problem with him, it is what it is.  Like you said, you're going to work and do your job.  Don't ever do less of your job.  Just be the guy that you were in the beginning, even though he's a dick.

**Plaintiff:** It gets tough because I want to be able to be comfortable, but once he's making certain comments--

**Defendant Ryan:** Those are stupid comments; if he makes a comment, you say aye, you fucking ginny, or whatever you want to do.  I don't think--

**Plaintiff:** The thing is, I don't--

**Defendant Ryan:** Maybe he's trying to get a rise out of you.

**Plaintiff:** Right.  I don't do things like that because then if it ever gets to that point where it's a shouting match, there's a side of me that it's-- It's like either or, Tim, and I know myself.  I don't want that.  You know what I'm saying?

**Defendant Ryan:** That's a level head.

**Plaintiff:** I don't want that.

**Defendant Ryan:** A level head, that's all.

**Plaintiff:** I'd rather just be professional.  We come in.  It's not a clubhouse.  We come in, we do our work, and we go home to our families.  Everything else is-

45. As evidenced by the recorded call above, Defendant Ryan aided and abetted Defendant Maimone's continued unlawful discrimination against Plaintiff by refusing to take his complaints seriously, investigate the claims, or take action to remediate Defendant Maimone's racist conduct.

46. Upon information and belief, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove aided and abetted Defendant Maimone's continued unlawful discrimination against Plaintiff by refusing to take his complaints seriously, investigate the claims, or take action to remediate Defendant Maimone's racist conduct.

RYAN REASSIGNS PLAINTIFF AND MAKES BIGOTED MAIMONE HIS DIRECT SUPERVISOR

47. Upon information and belief, shortly after fielding complaints from Plaintiff concerning Maimone referring to him as a Nigger, and after stupidly advising Maimone to retaliate by calling Maimone a "fucking ginny," Defendant Ryan inexplicably appointed Defendant Maimone to be Plaintiff's direct supervisor.

48. Additionally, Plaintiff was demoted and suffered back-breaking debilitating retaliation resulting in an avoidable on-the-job injury and workman's comp.

DEFENDANT RYAN AND MAIMONE CONSPIRED TO KEEP COVID19 WARNINGS AWAY FROM BLACK AND BROWN EMPLOYEES

49. In March of 2020, Defendant Coranet's Vice President of Finance, Cathy Cammarano ("Cammarano"), sent an email to select non-minority employees, including but not limited to Defendant Maimone, Silverio Maimone, Mike Ryan, and Defendant Ryan, advising that; several employees on Plaintiff's job site had contracted COVID-19, that the company was reviewing its options, a shutdown was possible, and not to discuss said email or the situation with any other employees.

50. Saverio Maimone showed Cammarano's email to Plaintiff.

51. Plaintiff grew immediately concerned for his health and well-being, knowing he recently had close contact with an infected employee who was admitted to the hospital with severe symptoms.

52. Plaintiff discussed the matter with Defendant Ryan, who downplayed the situation and dismissed Plaintiff's concerns outright.

53. In response, Plaintiff requested four days of paid time off (PTO) to seek COVID-19 testing and to prevent exposing other employees to the virus.

54. Defendant Ryan discussed Plaintiff's PTO request with Defendant Maimone, then denied it for pretextual reasons.

55. The actual reason for Defendants Maimone and Ryan's denial of Plaintiff's PTO request was that Plaintiff was African American and, therefore, of lesser social stature, expendable, and not worthy of knowing the truth.

56. These acts embody Defendant Coranet, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove's pervasive pattern of discriminating against minority employees by intentionally violating their rights to further the company's interests and profits.

57. Three or **four days** following Cammarano's initial email, a second company-wide email was sent advising all employees that, due to employees testing positive for COVID-19, a mandatory nine-day shutdown/quarantine had been issued, the company had not yet determined whether employees would be paid during that time and that employees were permitted to use PTO days during the shutdown to guarantee payment.  Non-minority employees who requested PTO time during this period were paid while Plaintiff was not.


RYAN AND MAIMONE RETALIATE AGAINST PLAINTIFF, CAUSING PHYSICAL INJURY

58. Plaintiff was frequently undermined by Defendant Ryan and Defendant Maimone and given unfavorable, strenuous, and dangerous job assignments in retaliation for his being an African American willing to confront racism in the workplace and disclose it.

59. One such unfavorable, particularly strenuous physical assignment, in September 2020 at the Discovery Channel headquarters, required Plaintiff to pull thousands of feet of heavy telecom cables on his hands and knees.  This strenuous assignment normally requires two men.

60. While working at the Discovery Channel headquarters in September 2020, Plaintiff injured his lower back during the performance of his assigned job-related duties.  Plaintiff

informed Defendant Maimone and Defendant Ryan of his specific work-related injury associated with physical pain and requested medical treatment.

61. Defendants Maimone and Ryan both ignored Plaintiff's request for medical attention and insisted he continued doing the same grueling work that caused the injury, only with less manpower to assist because they intentionally diverted employees elsewhere.

62. Defendants failed to provide or approve Plaintiff to receive authorized medical treatment.

63. In addition, Defendants failed to report Plaintiff's work-related incident and resulting injuries to their insurance carrier, denying Plaintiff entitled medical benefits for a work-related injury.

64. On or about October 22, 2020, Plaintiff reported his work-related injuries to Defendant's through workers' compensation.

<u>THE DEFENDANT'S RETALIATION CAUSED PLAINTIFF TO LOSE ACCESS TO BENEFITS AFFORDED TO HIS COLLEAGUES</u>

65. In retaliation, Defendant Coranet and Defendant Discovery failed to report Plaintiff's work-related injuries and refused to provide him with any authorized benefits or treatment.

66. As a result, Plaintiff was forced to seek two unauthorized medical consultations from NYU Langone Medical Center ("NYU Langone").

67. NYU Langone recommended MRIs were necessary to determine the extent of Plaintiff's back injuries.

68. Despite NYU Langone's recommendations, Defendant Coranet and Defendant Discovery advised Plaintiff it would not cover additional testing for Plaintiff's injuries.

69. Throughout the delays caused by Defendant Coranet's intentional and retaliatory mishandling of Plaintiff's worker's compensation claim, Plaintiff continued to work in pain, taking unpaid time off when necessary.

DEFENDANTS FAILED TO PROVIDE REASONABLE ACCOMMODATIONS

70. Upon Plaintiff informing Defendant Maimone and Defendant Ryan of his injuries, Defendant Ryan agreed to move Plaintiff to a different, less physically demanding job site.

71. However, upon arriving at the new site, Plaintiff soon realized that he was the only on-site employee and that all the required physical labor was solely his responsibility.

72. Defendant Ryan and Maimone ostracized Plaintiff to a different job site wherein he was required to perform even more physical labor.

73. This is in addition to the racial discrimination, harassment, and retaliation Plaintiff suffered after disclosing Defendant Maimone's racial harassment.


RYAN ENGAGES IN ANOTHER ACT OF DISCRIMINATORY RETALIATION

74. In late July 2020, Plaintiff planned a PTO day to attend a Black Lives Matter ("BLM") protest with his 19-year-old son.  Plaintiff's primary objective in attending the BLM protest was to look after the safety and well-being of his son.

75. When Defendant Maimone and Defendant Ryan learned that Plaintiff intended to use PTO time to attend a BLM protest, they engaged him in verbal discourse in front of other employees.

76. Therein, Defendants Maimone and Ryan ridiculed Plaintiff commenting that attending a BLM protest with his son was stupid, senseless, and irresponsible.

77. Defendant Ryan made clear, in front of everyone, that he would not approve a PTO request for any employee for such a "stupid reason."

78. No non-minority employees were ever made to justify the underlying reasons for a PTO request.

PLAINTIFF SENDS A COMPLAINT DIRECTLY TO CORANET CEO MARGARET MARCUCCI[2]

79. On or about November 18, 2020, Plaintiff emailed a complaint to Defendant Coranet's senior management, including CEO Margaret Marucci.

80. Plaintiff shared all the unlawful racial discrimination he had endured at the hands of Ryan and Maimone.

81. As part of his Complaint, Plaintiff provided Defendants with several audio recordings that substantiated his claim that Maimone engaged in serious racial discrimination, and Ryan allowed it.

82. On December 7, 2020, Plaintiff filed a written whistleblower complaint with the Occupational Safety and Health Administration ("OSHA").

83. Despite Plaintiff's disclosures and complaints, Defendant's refused to take action to investigate or remediate Plaintiff's claims of discrimination.


PLAINTIFF WAS PROHIBITED FROM RETURNING TO WORK UNTIL HE SIGNED THE NEW NO RECORDING POLICY[3]

84. Upon recovery from his injuries, Plaintiff was not allowed to return to work unless and until he signed Defendant's new policy that no employees were permitted to use personal or work cell phones to record racial discrimination by employees and supervisors.

85. Defendant Coranet's anti-recording policy was created and made mandatory to retaliate against Plaintiff for exposing the pattern of racial discrimination while continuing to discriminate against Plaintiff and similarly situated employees by preventing them from documenting these violations.

86. Instead of ending discrimination, Defendants decided to effectively silence complaints of racism.

---

[2] See attached **Exhibit B**: Email Complaint Sent to Margaret Marcucci.
[3] See attached **Exhibit E**: No Recording Policy.

## PLAINTIFF REFUSES TO SIGN THE ANTI-RECORDING POLICY AND IS FORCED TO RESIGN

87. Having displayed that Defendant Coranet, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove were unwilling to correct its racially discriminatory culture, Plaintiff refused to sign the new anti-recording policy.

88. Plaintiff was discriminated against for being African American by being denied payment for hours worked, denied access to servers where he could keep his independent time records, called a Nigger, demeaned, dismissed and undermined upon disclosure, ostracized, physically abused while injured, assigned difficult labor without support, and refused reasonable accommodations while injured.

89. Plaintiff was retaliated against for disclosing Defendant Maimone's racism by being ostracized, assigned manual labor while inured under false pretenses, and undermined by Defendant Ryan.

90. Plaintiff was forced to resign involuntarily due to the Defendant's severe and pervasive racial harassment.

THROUGHOUT HIS EMPLOYMENT, PLAINTIFF DIRECTLY INFORMED THE FOLLOWING INDIVIDUALS OF MAIMONE'S AND RYAN'S ACTIONS; DESPITE PLAINTIFF'S IRREFUTABLE REPORTING, THESE **WILLING PARTICIPANT** SENIOR EXECUTIVES PLACED PROFITS OVER PEOPLE IN CONDONING AND EMBOLDENING BIGOTED MAIMONE AND RYAN.



**Margaret Marcucci, CEO**

91. Notified by Plaintiff via Email on November 18, 2020.  As of the date of this Complaint, <u>Maimone</u> and Ryan are still in their positions with Coranet and still possess the ability to harm and discriminate against African Americans and other ethnic groups.



**Thomas Waters**
**VP Commercial Service Delivery and Engineering**

92. Notified by Plaintiff on or about November 18, 2022.  As of the date of this Complaint, <u>Maimone</u> and Ryan are still in their positions with Coranet and still possess the ability to harm and discriminate against African Americans and other ethnic groups.

## DEFENDANT BOA, DEFENDANT NBC, DEFENDANT DISCOVERY, DEFENDANT ESPN, AND DEFENDANT PENS GROVE WERE THE PLAINTIFFS' JOINT EMPLOYERS

93. The joint-employer doctrine holds that "an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violations of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer." *Arculeo*, 425 F.3d at 198.

94. Assessment of the joint-employer doctrine is particularly prudent in situations of "temporary employment or staffing agencies and their client entities." *Farzan v. Wells Fargo Bank, N.A.*, No. 12-CV-1217 (RJS) (JLC), 2013 U.S. Dist. LEXIS 169743, 2013 WL 6231615, at *16 (S.D.N.Y. December 2, 2013), *subsequently aff'd sub. nom. Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir 2015); *see also Liotard v. FedEx Freight Corp.*, No. 14-CV-2083 (NSR), 2016 U.S. Dist. LEXIS 34754, 2016 WL 1071034, *5 (S.D.N.Y. March 17, 2016) (noting that joint employer doctrine particularly relevant in staffing agency circumstances).

95. Though the Second Circuit has not articulated "a test for what constitutes joint employment in the context of Title VII," *see Arculeo*, 425 F.3d at 199 n. 7; *Shiflett*, 601 F. App'x at 30, it has held that such a finding requires "sufficient evidence of immediate control over the employees," *Clinton's Ditch Co-op Co. v. NLRB*, 778 F.2d 132, 138 (2d Cir. 1985).

96. Five factors bear on the immediate control determination: "whether the alleged joint employer (1) did the hiring and firing; (2) directly administered any disciplinary procedures; (3) maintained records of hours, handled the payroll, or provided insurance; (4) directly supervised the employees; or (5) participated in the collective bargaining process." *Liotard*, 2016 U.S. Dist. LEXIS 34754, 2016 WL 1071034, at *4 (quoting *AT&T v. NLRB*, 67 F.3d 446, 451 (2d Cir. 1995); *see also Shiflett*, 601 F. App'x at 30 ("[F]actors courts have used to examine whether an entity constitutes a joint employer of an individual include 'commonality of hiring, firing, discipline, pay, insurance, records, and supervision.").

DID THE HIRING AND FIRING

97. Upon information and belief, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove all recruited Plaintiff to work on projects within their facilities.

98. As was the case with all their employees, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove required Plaintiff to clear a background check.   They provided him with an employee identification card and determined when he worked and for how long he worked.

99. Upon information and belief, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove had the power to terminate Plaintiff's employment, the same way they had the power to hire him.


SUPERVISED THE EMPLOYEES

100.     Upon information and belief, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove independently supervised Plaintiff's work product while Plaintiff worked in their facilities.

101.     Upon information and belief, Plaintiff's on-site supervisors were employees of Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove.   Coranet did not employ them.


ADMINISTERED ANY DISCIPLINARY PROCEDURES/HANDLED PAYROLL

102.     Upon information and belief, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove had the ability to terminate Plaintiff's employment as a form of discipline.

103.     Additionally, if Plaintiff failed to show up for work, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove had the ability to dock his pay or to remove him from the schedule altogether.

104.     Relevant to the inquiry here, "[i]n the temporary employment context, at common law, the status of a person employed under such circumstances would be determined under the loaned servant doctrine, which provides that an employee directed or permitted to perform services for another 'special' employer may become that employer's employee

while performing those services." *Liotard*, 2016 U.S. Dist. LEXIS 34754, 2016 WL 1071034, at *5 (quoting *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 611 F.Supp. 344, 349 (S.D.N.Y. 1984) *aff'd sub nom. Amarnare v. Merrill Lynch*, 770 F.2d 157 (2d Cir. 1985)) (internal quotations and alterations omitted).  Gilani v. Hewlett-Packard Co., No. 15-CV-5609 (NSR), 2018 U.S. Dist. LEXIS 156300, at *10-12 (S.D.N.Y. September 12, 2018).

105.     As Plaintiff's joint employer, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove had a duty and obligation to ensure that Plaintiff was not subject to Maimone's relentless acts of race discrimination and Ryan's acts of complacency and retaliation.

106.     As Plaintiff's joint employer, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove had a duty to ensure that Plaintiff was paid his overtime in accordance with city and state law.

107.     As Plaintiff's joint employer, Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove had a duty to ensure that Plaintiff was paid equally with his Caucasian colleagues who did the same work that required the same skill and same effort.

## VIOLATION OF THE EQUAL PAY ACT

108.     As the Second Circuit clarified in *Lenzi v. Systemax, Inc.*, Title VII, and thus the NYSHRL and NYCHRL, have a broader range of concerns than does the Equal Pay Act. 944 F.3d 97 (2d Cir. 2019).  "[A] Title VII plaintiff alleging a discriminatory compensation practice need not establish that s/he performed equal work for unequal pay.  By its plain terms, Title VII makes actionable *any* form of sex-based compensation discrimination." *Id.* at 110 (emphasis in original).  Moazzaz's allegations in support of her Equal Pay Act claim bolster but are not strictly necessary for her claims under the NYSHRL and NYCHRL. Moazzaz v. Metlife, Inc., No. 19-CV-10531 (JPO), 2021 U.S. Dist. LEXIS 40776, at *16 n.1 (S.D.N.Y. March 4, 2021).

109.     The core tenet of the Equal Pay Act and its state analogue is that employees, irrespective of their gender, should receive equal pay for equal work.  *E.E.O.C. v. Port Auth. of New York & New Jersey*, 768 F.3d 247, 254 (2d Cir. 2014).

110.     The statutes are not implicated every time employees of one gender receive greater compensation than employees of another.

111.     Rather, the statutes are explicitly limited to circumstances in which employees, based on their gender, receive greater compensation "for equal work on jobs the performance of which requires equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1); N.Y.L.L. § 194(1). Moazzaz v. Metlife, Inc., No. 19-CV-10531 (JPO), 2021 U.S. Dist. LEXIS 40776, at *15-16 (S.D.N.Y. March 4, 2021).

112.     Here, as stated above, Plaintiff is an African American male.

113.     Plaintiff worked as a Lead Technician.

114.     Plaintiff possesses over 20 years of experience[4] working as a Lead technician. Plaintiff has OSHA certifications, BICSI certification, A+ certification, Fiber certification, and Data Scientist Certification.

115.     Plaintiff was more than qualified to execute the essential functions of his role as Lead Technician.

116.     Upon information and belief, a Lead Technician in Defendant's corporation required the following: planning and scoping portions of the infrastructure needs; being a key administrator of necessary functions within the IT Network Systems; conducting job site management and Project Management responsibilities within the IT Network division; supporting and maintaining computer systems, desktop systems and peripherals; installing, diagnosing, repairing, and updating hardware and equipment ( Servers, Switches, Racks); troubleshooting systems issues for resolution; traveling to remote and resort locations to assist in information technology (IT) support and special projects several times per year; and maintaining and enforcing various IT policies and procedures, asset inventory, and departmental reports.

117.     The following chart breaks down how Plaintiff was treated in relation to his Caucasian and female comparators:

| Name | Demographic | Salary | Experience | Overtime Given |
|------|-------------|--------|------------|----------------|
| Plaintiff | African American Male | $68,000.00 | 20 years | Scarce to None |

---

[4] See attached **Exhibit C**: a copy of Plaintiff's Resume.

| Caitlin McConnell | Caucasian Female | $90,000.00 + | Two years | Unlimited |
|---|---|---|---|---|
| Mike Ryan | Caucasian Male | $90,000.00 + | Seven years | Unlimited |
| Saverio Maimone | Caucasian Male | $90,000.00 + | Ten years | Unlimited |

## FAILURE TO PAY OVERTIME IN VIOLATION OF THE NYLL AND FLSA

118.   The Fair Labor Standards Act requires covered employers to pay employees at least the applicable federal minimum wage for all hours worked and overtime pay for hours worked over 40 hours in a workweek.

119.   Infrastructure technology providers have covered employers under Section 3(s)(1)(B) of the FLSA.

120.   Lead technicians are covered employees by Section 213(b)(8)(A) of the Fair Labor Standards Act (Act), 29 USCS section 201 et seq., effective May 1, 1974.

121.   According to the NYLL, an employer must pay overtime to employees, unless otherwise exempt, at the rate of 1½ times the employee's regular pay rate for all hours worked over 40 hours in a workweek.

122.   Upon information and belief, Plaintiff is prepared to prove that the defendants stole hundreds of hours of overtime from him.

123.   The evidence will show that Plaintiff Started work at 6 am and would leave at 5 pm. This is an average of 11 hours a day.

124.   Upon information and belief, in a 7-day work week, Plaintiff worked an average of 60 to 70 hours a week.  These hours were not reflected in his paychecks.

## AS FOR THE FIRST CAUSE OF ACTION
## ADA DISABILITY DISCRIMINATION

125.   Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

126.   The Americans with Disabilities Act, 42 U.S.C. § 12101, et seq., prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112.

127.   Because having two herniated discs on his lower back substantially limits at least one of Plaintiff's major life activities, Plaintiff is an individual with a disability under the ADA.

128.   Plaintiff was fully qualified to be a Lead Technician and could perform all the essential functions of the position, as evidenced by his 20 years of experience and countless certifications.  Plaintiff worked for Defendant for over a year before he was diagnosed with two herniated discs on his lower back and was constructively discharged, as detailed above.

   a.   Defendant is a covered employer to which the ADA applies.

   b.   Defendant constructively discharged Plaintiff from employment solely because Plaintiff requested reasonable accommodations of not working with a racist, not lifting over fifty pounds, and being required to bend and stand for extended periods.

129.   Defendant made no individualized assessment to determine whether Plaintiff could perform the job's essential functions or whether a reasonable alternate accommodation would enable him to be employed as a Lead Technician by Defendant, as is required under the ADA.

130.   Defendant's constructive discharge of Plaintiff is based on his disability, and Defendant's failure to make an individualized assessment to determine whether Plaintiff could be employed or whether a reasonable accommodation would enable him to be employed by Defendant violated the ADA.

131.   Defendant's conduct was an intentional, willful, deliberate, and callous disregard for Plaintiff's rights.  As a result of Defendant's actions, Plaintiff has suffered and will continue to suffer economic and non-economic harm.  Because of the defendants' discrimination and retaliation, Plaintiff is entitled to all legal and equitable remedies available under the law.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

   a.   Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

   b.   Punitive damages;

   c.   Attorney fees, pre-and post-judgment interest, and cost of suit;

   d.   Such other relief as the Court may deem just and appropriate under the circumstances.

## AS FOR THE SECOND CAUSE OF ACTION
## AS FOR THE SECOND CAUSE OF ACTION, ADA RETALIATION

132.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

133.    To state a retaliation claim under the ADA or Title VII, a plaintiff must allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 315-16 (2d Cir. 2015) (citation omitted) (setting forth elements of a Title VII retaliation claim); *see also Smith v. New York City Dep't of Educ.*, 808 F. Supp. 2d 569, 581 (S.D.N.Y. 2011) (setting forth elements of an ADA retaliation claim and noting that "[r]etaliation claims under the ADA . . . subject to the same burden-shifting analysis as claims arising under Title VII"). *McCarrick v. Corning, Inc.*, No. 18-CV-6435-FPG, 2019 U.S. Dist. LEXIS 81227, at *7-8 (W.D.N.Y. May 14, 2019).

PARTICIPATION IN A PROTECTED ACTIVITY

134.    Here, Plaintiff participated in protected activity when he was diagnosed with having two herniated discs on his lower back.

THE DEFENDANTS WERE AWARE THAT PLAINTIFF WAS DISABLED

135.    As detailed above, Plaintiff's medical provider diagnosed him with having two herniated discs on his lower back.  Plaintiff attempted to utilize the Firm's workman's comp program, to facilitate his medical treatment.  Defendants initially blocked his requests, and Plaintiff was required to seek a medical assessment from an independent physician.  Upon information and belief, Plaintiff's medical provider informed Defendants that he had two herniated discs on his lower back, could not lift more than fifty pounds, and could not bend or stand for extended periods.

DEFENDANTS RETALIATED AGAINST PLAINTIFF UPON RETURN FROM DISABILITY LEAVE

136.    As detailed above, upon Plaintiff's return from disability leave, he was a victim of sophisticated systemic harassment and retaliation orchestrated by Ryan and Maimone.  In addition, Plaintiff was intentionally isolated from his colleagues.  Upon information and belief, the intentional isolation[5] of Plaintiff upon return to work was in the following form:

---

[5] The social environment in a workplace can prove to be a powerful motivator; fear of employer-sponsored isolation "might well" influence an employee's decision whether to "make or support a charge of discrimination." *White*, 548 U.S. at 57.  *Flowers v. N. Middlesex YMCA*, No. 3:15-cv-705 (MPS), 2016 U.S. Dist. LEXIS 31469, at *28 (D. Conn. March 11, 2016).

    a.   Minimal to no contact with colleagues.

    b.   A demotion from Lead Technician to Apprentice.  As a Lead Technician, Plaintiff was not required to lift, bend or stand for extended periods.  Plaintiff's role before returning from his disability leave was ideal for his reasonable accommodation requests.  Knowing this, Defendants intentionally demoted Plaintiff to an apprentice, a role that required heavy lifting, constant bending, and standing.

    c.   Plaintiff's demotion was per se retaliation[6].

CAUSAL CONNECTION BETWEEN PLAINTIFF TAKING DISABILITY LEAVE AND THE RETALIATION

137.    As detailed above, the temporal proximity between Plaintiff's attempted return to work and Defendant's intentional acts detailed in the preceding paragraphs are so close that it removes all doubt of retaliatory intent.

138.    As previously stated, and as evidenced by his 20+years of experience, Plaintiff was fully qualified to be a Lead Technician and could perform all the essential functions of the position.  Plaintiff worked for Defendant for over a year before he was diagnosed with two herniated discs on his lower back and was constructively discharged, as detailed above.

139.    Defendant is a covered employer to which the ADA applies.

140.    Defendant's conduct was an intentional, willful, deliberate, and callous disregard for Plaintiff's rights.  As a result of Defendant's actions, Plaintiff has suffered and will continue to suffer economic and non-economic harm.  Because of the defendants' discrimination and retaliation, Plaintiff is entitled to all legal and equitable remedies available under the law.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

---

[6] Viewing Plaintiff's alleged adverse actions in the aggregate, the Court finds that Plaintiff has raised triable issues of fact as to whether the withholding of documents, stripping of responsibilities, hostility, assignment to an isolated cubicle, failure to receive a multiline telephone, and malfunctioning security badge constitute adverse actions.  These incidents, to the extent they were intentional, would dissuade a reasonable employee from making a discrimination charge."); *Siddiqi v. N.Y.C.  Health & Hosps. Corp.*, 572 F. Supp.  2d 353, 372 (S.D.N.Y. 2008) ("[F]or the purposes of a retaliation claim, bad performance reviews are an adverse employment action."). *Van Brunt-Piehler v. Absolute Software, Inc.*, 504 F. Supp. 3d 175, 195 (W.D.N.Y. 2020).

That Plaintiff maintained the same salary is of little consequence because "even where a plaintiff retains the same title and salary following a transfer, [s]he may demonstrate an adverse action by showing that [s]he has been *de facto* 'stripped of [her job] responsibilities and not allowed to perform those functions.'" *Torregiano v. Monroe Comm. College*, 11-CV-6300, 2015 U.S. Dist. LEXIS 144992, 2015 WL 6641784, at *12 (W.D.N.Y. Oct. 26, 2015). *Panagopoulos v. N.Y.  State DOT*, 172 F. Supp. 3d 597, 619 (N.D.N.Y. 2016).

a. Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b. Punitive damages;

c. Attorney fees, pre-and post-judgment interest, and cost of suit;

d. Such other relief as the Court may deem just and appropriate under the circumstances.

## AS FOR THE THIRD CAUSE OF ACTION
## CONSTRUCTIVE DISCHARGE[7]
## NJLAD, NYCHRL, NYSHRL

141.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

142.    A constructive discharge claim requires a showing that "an employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Ingrassia v. Health and Hosp. Corp.*, 130 F. Supp.  3d 709, 724 (E.D.N.Y. 2015) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983)).

143.    An employee must show that "he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign... [and that] he actually resigned." *Richard v. N.Y.C. Dep't of Educ.*, No. 16-CV-957(MKB), 2017 U.S. Dist. LEXIS 50748, 2017 WL 1232498, at *13 (E.D.N.Y. March 31, 2017) (internal quotation marks omitted) (quoting *Green v. Brennan*, 578 U.S. 547, 136 S.Ct. 1769, 1777, 195 L. Ed. 2d 44 (2016)).

144.    An employee plaintiff is not required to prove that h[is]er employer intended to cause h[is]er resignation but must show that the Defendant's actions were deliberate.  See *Murdaugh v. City of New York*, No. 10-Civ-7218(HB), 2011 U.S. Dist. LEXIS 23333, 2011 WL 798844.  *Knight v. MTA N.Y.C. Transit Auth.*, No. 19 CV 1428 (PKC)(LB), 2021 U.S. Dist. LEXIS 187672, at *25-26 (E.D.N.Y. September 28, 2021).

DEFENDANTS CREATE AN INTOLERABLE WORK ENVIRONMENT

145.    As detailed above, Defendants and its agents created an intolerable working environment throughout Plaintiff's employment.  Plaintiff experienced the following:

---

[7] See attached **Exhibit D**: Resignation Letter.

    a. Retaliation after exposing Maimone's racist rants and unprofessional behavior,

    b. Isolation in the act of retaliation after being demoted within weeks of complaining about Maimone's bigotry, and

    c. Being demoted.

146. After raising concerns about the acts, Plaintiff was ignored by senior management and his supervisors.

147. As a direct result of their raced-based retaliation, Plaintiff became injured by on the job because his colleagues were prohibited from assisting him on a two-person job.

<u>PLAINTIFF ATTEMPTED TO MAINTAIN HIS RESOLVE AND CONTINUE WORKING, BUT THE RACIAL DISCRIMINATION AND INTENTIONAL ISOLATION FROM HIS COLLEAGUES MADE EXECUTING HIS ROLE IMPOSSIBLE</u>

148. Here, any objective, reasonable person in Plaintiff's position would have resigned if faced with intentional isolation from their work colleagues.

149. As detailed above, Plaintiff's job required him to interact with colleagues to execute the essential functions of his job safely and effectively.

150. Plaintiff was also referred to as a nigger.

151. Plaintiff was injured on the job as a direct result of the Defendants' retaliatory bigotry.

152. Plaintiff was forced to resign after receiving an ultimatum that he had to sign a nondisclosure agreement and a contract agreeing not to record or document his colleague's bigotry while in the workplace.

<u>DEFENDANT'S ACTIONS WERE DELIBERATE</u>

153. Here, as evidenced by the emails Plaintiff sent to HR and senior management, as well as the many recorded conversations in Plaintiff's possession, Plaintiff complained about Maimones abusive behavior, his retaliatory demotion, and being injured on the job as a result of Maimone and Ryan forbidding his colleagues from helping him on two-person jobs. Plaintiff has text messages from his colleagues detailing this fact.

154. The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Plaintiff's rights. As a result of Defendant's actions, Plaintiff has suffered and will continue to suffer economic and non-economic harm. Because of the Defendants' discrimination and retaliation, Plaintiff is entitled to all legal and equitable remedies available under the law.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

    a. Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

    b. Punitive damages;

    c. Attorney fees, pre-and post-judgment interest, and cost of suit;

    d. Such other relief as the Court may deem just and appropriate under the circumstances.

**AS FOR THE FOURTH CAUSE OF ACTION**
**VIOLATION OF TITLE VII, NJLAD, THE NYSHRL AND NYCHRL**

155.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

156.    The New York State Human Rights Law (*see* Executive Law § 296) prohibits discrimination in employment based on an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status (*see* Executive Law § 296[1][a]). The same and or similar standards apply for Title VII, NJLAD, and the NYCHRL.

157.    To establish a prima facie violation of this provision, a plaintiff must show at trial that (1) he or she is a member of a protected class, (2) he or she was qualified to hold the subject position, (3) he or she was terminated from employment or suffered another adverse employment action, and (4) the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination (*see Forrest v Jewish Guild for the Blind*, 3 NY3d 295, 305, 819 N.E.2d 998, 786 N.Y.S.2d 382; *Cotterell v State of New York*, 129 AD3d 653, 654, 10 N.Y.S.3d 558). *D'Agostino v. MMC E., LLC*, 2020 NY Slip Op 03381, ¶ 2, 184 A.D.3d 719, 721, 125 A.D.3d 751, 721, 125 N.Y.S.3d 751, 753 (App. Div.).

<u>PLAINTIFF IS A MEMBER OF A PROTECTED CLASS</u>

158.    As detailed above, Plaintiff is an African American male, and as an African American male, Plaintiff is a member of the minority protected class.

<u>PLAINTIFF WAS QUALIFIED FOR HIS POSITION AS LEAD TECHNICIAN</u>

159.    Here, as evidenced by his resume, Plaintiff executed the following essential functions

of his role as Lead technician:

  d.  Planning and scoping portions of the infrastructure needs,
  e.  The key administrator of necessary functions within the IT Network Systems,
  f.  Job site management and Project Management responsibilities within the IT Network division,
  g.  Supports and maintains computer systems, desktop systems, and peripherals,
  h.  Installs, diagnoses, repairs, and updates hardware and equipment (Servers, Switches, Racks),
  i.  Troubleshoots systems issues for resolution,
  j.  Travels to remote and resort locations to assist in information technology (IT) support and special projects several times per year, and
  k.  Maintains and enforces various IT policies and procedures, asset inventory, and departmental reports.

PLAINTIFF SUFFERED AN ADVERSE EMPLOYMENT ACTION

160.    Here, as evidenced by a recorded call, emails, and Defendant's actions, Plaintiff was

subjected to nonstop name calling (NIGGER); he was demoted after complaining about

Maimone calling him a Nigger, to make matters worse, Maimone, who was his equal, was

then appointed by Ryan to be Plaintiff's supervisor after Plaintiff complained about

Maimone calling him a NIGGER.

161.    Plaintiff was then required to work a two-person job alone and suffered severe back

injuries because Ryan and Maimone prohibited Plaintiff's colleagues from helping him.

THE ADVERSE ACTION OCCURRED UNDER CIRCUMSTANCES GIVING RISE TO AN
INFERENCE OF DISCRIMINATION

162.    Here, as detailed above, the temporal proximity between the Complaint vs. and the

Defendant's documented acts of retaliation is so close that it removes all doubt of

discriminatory intent.

163.    The Defendants' conduct was intentional, willful, deliberate, and in callous disregard

for Plaintiff's rights.  As a result of Defendant's actions, Plaintiff has suffered and will

continue to suffer economic and non-economic harm.  Because of the Defendants'

discrimination and retaliation, Plaintiff is entitled to all legal and equitable remedies

available under the law.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the

following relief:

a.  Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b.  Punitive damages;

c.  Attorney fees, pre-and post-judgment interest, and cost of suit;

d.  Such other relief as the Court may deem just and appropriate under the circumstances.

## AS FOR THE FIFTH CAUSE OF ACTION
### Retaliation under Title VII, NJLAD, NYCHRL, and NYSHRL

164.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

RETALIATION UNDER Title VII, NJLAD, NYSHRL

165.    To state a *prima facie* case, Plaintiff must allege (1) that he participated in a protected activity, (2) that his participation was known to his employer, and (3) that his employer, after that, subjected him to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  *Mondelo v. Quinn, Emanuel, Urquhart & Sullivan, LLP*, No. 21 Civ 02512 (CM), 2022 U.S. Dist. LEXIS 31075, at *29 (S.D.N.Y. February 22, 2022).

PLAINTIFF PARTICIPATED IN A PROTECTED ACTIVITY

166.    As detailed above, Plaintiff participated in protected activity when he raised concerns about Maimone's bigotry and Ryan's capitulation and retaliation.

DEFENDANTS KNEW OF PLAINTIFF'S PARTICIPATION IN A PROTECTED ACTIVITY

167.    As detailed above, the defendants were made aware of Plaintiff's participation in a protected activity because Plaintiff cooperated with Human Resources' sham investigation into Maimone's bigotry and Ryan's retaliation.  In real-time, as the discrimination unfolded, Plaintiff also informed the on-site managers of Defendant BOA, Defendant NBC, Defendant Discovery, Defendant ESPN, and Defendant Pens Grove.

MATERIALLY ADVERSE EMPLOYMENT ACTION

168.    Here, as detailed above, Plaintiff was the victim of relentless acts of retaliation:

l.  Denied equal assistance in performing the essential functions of a two-person job,

m. Demoted after complaining about Maimone's bigotry and Ryan's capitulation,

n.  Heightened scrutiny of Plaintiff's work product in comparison to his colleagues, and

o.  On a recorded call, Defendant Ryan downplayed Plaintiff's concerns about being called a NIGGER and Plaintiff's fears of retaliation.

p.  He then retaliated against Plaintiff by demoting him and making the man that called him a nigger his new supervisor.

## CAUSAL CONNECTION BETWEEN THE PROTECTED ACTIVITY AND THE ADVERSE EMPLOYMENT ACTION

169.    Here, as detailed above, the temporal proximity between the Complaint vs. and the Defendant's documented acts of retaliation is so close that it removes all doubt of discriminatory intent.

170.    The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Plaintiff's rights.  As a result of Defendant's actions, Plaintiff has suffered and will continue to suffer economic and non-economic harm.  Because of the Defendants' discrimination and retaliation, Plaintiff is entitled to all legal and equitable remedies available under the law.

## RETALIATION UNDER NYCHRL

171.    The elements of retaliation claims brought against employers under § 1983 or the NYSHRL mirror those under Title VII.  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015).  By contrast, NYCHRL claims "must be analyzed separately and independently from federal and state discrimination claims." *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 112-13 (2d Cir. 2013). The NYCHRL's retaliation provision must be interpreted broadly and provides liability for conduct not covered by its federal and state counterparts.  *Campo v. City of N.Y.,* No. 19-CV-04364 (NGG) (SJB), 2022 U.S. Dist. LEXIS 60288, at *18 (E.D.N.Y. March 31, 2022).

172.    The NYCHRL provides that "[i]t shall be an unlawful discriminatory practice ... to retaliate or discriminate in any manner against any person because such person has ... opposed any practice forbidden under this chapter." N.Y.C. Admin.  Code § 8-107(7). "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a result, the employer

engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (citation omitted).

## ENGAGED IN PROTECTED ACTIVITY

173.    As detailed above, Plaintiff participated in protected activity when he raised concerns about Maimone's bigotry and Ryan's capitulation and retaliation.

## PLAINTIFF HAD A GOOD FAITH BELIEF THAT
## MAIMONE'S ACTIONS WERE UNLAWFUL

174.    The plaintiff "need not prove that her underlying complaint of discrimination had merit but only that it was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013)

175.    As detailed above, by reporting Maimone's bigotry and Ryan's capitulation, Plaintiff sacrificed his career in standing up for himself.

176.    As detailed in the recorded call, Plaintiff's motivation for reporting Maimone's behavior was to shine a light on his misconduct and callous discrimination, which is evident in the clear acts of retaliation experienced by Plaintiff.

## MATERIALLY ADVERSE EMPLOYMENT ACTION

177.    Here, as detailed above, Plaintiff was the victim of relentless acts of retaliation:

    q.    Denied equal assistance in performing the essential functions of a two-person job,

    r.    Demoted after complaining about Maimone's bigotry and Ryan's capitulation,

    s.    Heightened scrutiny of Plaintiff's work product in comparison to his colleagues, and

    t.    On a recorded call, Defendant Ryan downplayed Plaintiff's concerns about being called a NIGGER and Plaintiff's fears of retaliation.  He then retaliated against Plaintiff by demoting him and making the man that called him a nigger his new supervisor.

## CAUSAL CONNECTION BETWEEN THE PROTECTED ACTIVITY AND
## THE ADVERSE EMPLOYMENT ACTION

178.    Here, as detailed above, the temporal proximity between the Complaint vs. and the Defendant's documented acts of retaliation is so close that it removes all doubt of discriminatory intent.

179.    The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Plaintiff's rights.  As a result of Defendant's actions, Plaintiff has suffered and will

continue to suffer economic and non-economic harm.  Because of the Defendants' discrimination and retaliation, Plaintiff is entitled to all legal and equitable remedies available under the law.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

    a.  Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

    b.  Punitive damages;

    c.  Attorney fees, pre-and post-judgment interest, and cost of suit;

    d.  Such other relief as the Court may deem just and appropriate under the circumstances.

### AS FOR THE SIXTH CAUSE OF ACTION
#### Intentional Infliction of Emotional Distress

180.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

181.    Under New York Law, [IIED] has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial possibility of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'" *Saleh*, 2013 U.S. Dist. LEXIS 142207, 2013 WL 5439140, at \*11.  *Tigano v. United States*, 527 F. Supp. 3d 232, 246 (E.D.N.Y. 2021).

EXTREME AND OUTRAGEOUS CONDUCT

182.    Here, as detailed above, Defendants engaged in several acts of extreme and outrageous conduct.  The following is a sample of the extreme and outrageous conduct visited upon Plaintiff:

    a.  Demoted Plaintiff when he returned from medical leave,

    b.  Denied equal access to overtime,

    c.  Denied equal pay,

    d.  Called a NIGGER on multiple occasions by Maimone,

    e.  Forced to file an OSHA complaint,

    f.  Retaliation for filing OSHA complaint,

g.  Intentional isolation from members of his team upon his return to work after a disability leave,

h.  Denial of his requested accommodations upon return from disability leave,

i.  Denial of unpaid wages, and

j.  Denial of Plaintiff's return to work unless and until he signed Defendant Coranet's new policy that no employees were permitted to use personal or work cell phones to record instances of racial discrimination by employees and supervisors.

DEFENDANTS INTENDED TO CAUSE PLAINTIFF HARM

183.  It is evident from a recorded conversation that Defendant called Plaintiff a NIGGER and engaged in countless acts of retaliation to justify it, cover it up, and punish Plaintiff for engaging in protected activity when he reported the discrimination.

184.  As part of the retaliation, Defendants demoted Plaintiff from Lead Technician to Apprentice and then deprived him of any help after he reported to them that he was injured.

THERE WAS A CAUSAL CONNECTION BETWEEN DEFENDANT'S CONDUCT AND PLAINTIFF'S INJURIES

185.  As detailed above, the temporal proximity between Plaintiff reporting Maimone's bigotry, the intentional reappointment of his attacker as his supervisor, his demotion from lead technician to apprentice, attempted return to work after a disability leave, their refusal to accommodate Plaintiff, and the Firm's intentional acts detailed in the preceding paragraphs are so close that it removes all doubt of harm visited upon Plaintiff.

PLAINTIFF SUFFERED SEVERE EMOTIONAL DISTRESS

186.  As evidenced by Plaintiff's medical provider's medical records, Plaintiff has suffered immensely.  Plaintiff's mental and emotional distress can be revealed under seal.

187.  The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Plaintiff's rights.  As a result of Defendant's actions, Plaintiff has suffered and will continue to suffer economic and non-economic harm.  Because of the Defendants' discrimination and retaliation, Plaintiff is entitled to all legal and equitable remedies available under the law.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

a. Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b. Punitive damages;

c. Attorney fees, pre-and post-judgment interest, and cost of suit;

d. Such other relief as the Court may deem just and appropriate under the circumstances.

## AS FOR THE SEVENTH CAUSE OF ACTION
### Negligent Hiring, Retention

188.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

189.    A cause of action for negligent hiring and retention requires allegations that an employer knew of its employee's harmful propensities, that it failed to take necessary action, and that this failure caused damage to others (*see Gonzalez v City of New York*, 133 AD3d 65, 67-68, 17 N.Y.S.3d 12 [1st Dept 2015]; Restatement [Second] of Agency § 213, Comment *d*).  The cause of action does not need to be pleaded with specificity (*Doe v Enlarged City Sch. Dist. of Middletown*, 195 AD3d 595, 596, 144 N.Y.S.3d 639 [2d Dept 2021]; *see JG v Goldfinger*, 161 AD3d 640, 641, 79 N.Y.S.3d 1 [1st Dept 2018]). *Waterbury v. N.Y.C. Ballet, Inc.*, 2022 NY Slip Op 02890, ¶ 4, 205 A.D.3d 154, 160, 168 N.Y.S.3d 417, 423 (App. Div.).

THE DEFENDANTS KNEW OF MAIMONE'S BIGOTRY AND RYAN'S CAPITULATION

190.    As detailed above, Plaintiff emailed the CEO, Marcucci, in November 2020 and participated in a Human Resources investigation surrounding Maimone's bigotry and Ryan's capitulation.

191.    The CEO and Human Resources did ***nothing*** to stop Maimone and Ryan.

192.    They doubled down on the bigotry when they demanded Plaintiff sign a document that laid out a new no-recording policy and a nondisclosure agreement concerning the claims raised in this Complaint.

193.    Defendants did not apologize to Plaintiff or terminate Maimone and Ryan.

194.    Upon information and belief, Marcucci and Waters knew Maimone's bigotry and Ryan's capitulation.  They were made aware of this by Plaintiff directly and indirectly.

195.    After learning of Maimone and Ryan's deplorable behavior, Marcucci and Waters ignored it, placing Plaintiff and other minorities or anyone willing to speak up in harm's way.

196.    The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Plaintiff's rights.  As a result of Defendant's actions, Plaintiff has suffered and will continue to suffer economic and non-economic harm.  Because of the Defendants' discrimination and retaliation, Plaintiff is entitled to all legal and equitable remedies available under the law.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

a.  Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b.  Punitive damages;

c.  Attorney fees, pre-and post-judgment interest, and cost of suit;

d.  Such other relief as the Court may deem just and appropriate under the circumstances.

### EIGHTH CAUSE OF ACTION
### VIOLATION OF THE EQUAL PAY ACT OF 1963
### the NYS EQUAL PAY ACT, and the NJLAD

197.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

198.    Upon information and belief, at all times relevant to this action, Defendants were Plaintiff's employers within the meaning of 29 U.S.C. § 255(a) of the Equal Pay Act. Defendants had the power to hire and fire Plaintiff, control the terms and conditions of his employment, and determine the rate and method of any compensation in exchange for his employment.

199.    Upon information and belief, at all times relevant to this action, Defendants were engaged in commerce, industry, or activity affecting commerce.  Defendants constitute an enterprise within 29 U.S.C. § 255(a) of the Equal Pay Act and the NYS Equal Pay Act.

200.    Upon information and belief, Defendants failed to pay Plaintiff equally with his female colleagues whose job performance of which requires equal skill, effort, and

responsibility and which are performed under similar working conditions, in violation of 29 U.S.C. § 255(a) of the Equal Pay Act, and NYS Equal Pay Act.

201.    Upon information and belief, Plaintiff and similarly situated female colleague Caitlin McConnell performed similar job duties and functions as Lead Technicians.

202.    Upon information and belief, Plaintiff asserts that he planned and scoped portions of the infrastructure needs; was a key administrator of necessary functions within the IT Network Systems; conducted job site management and Project Management responsibilities within the IT Network division; supported and maintained computer systems, desktop systems, and peripherals; installing, diagnosing, repairing, and updating hardware and equipment (Servers, Switches, Racks);  troubleshoot systems issues for resolution; traveled to remote and resort locations to assist in information technology (IT) support and special projects several times per year; and maintained and enforced various IT policies and procedures, asset inventory, and departmental reports.

203.    Upon information and belief, Defendants discriminated against Plaintiff by subjecting him to discriminatory pay, discriminatory denial of bonuses and other compensation incentives, discriminatory denial of promotions and titles, and other forms of discrimination in compensation in violation of the Equal Pay Act.

204.    Upon information and belief, Plaintiff earned $68,000.00 per year as a Lead Technician, while his similarly situated female colleague, Caitlin McConnell, earned $90,000.00 per year as a Lead Technician.

205.    The difference in pay between Plaintiff and Caitlin McConnell was not due to seniority, merit, quantity or quality of production, or a factor other than sex.  Instead, the differential in pay was due to Plaintiff's gender and race.

206.    Defendant's failure to pay Plaintiff equally with his female coworkers was willful within the meaning of 29 U.S.C. § 255(a) of the Equal Pay Act.

207.    Plaintiff was damaged in an amount to be determined at trial.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

    a.    Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b.  Punitive damages;

c.  Attorney fees, pre-and post-judgment interest, and cost of suit;

d.  Such other relief as the Court may deem just and appropriate under the circumstances.

### NINTH CAUSE OF ACTION
### FAIR LABOR STANDARDS ACT-OVERTIME WAGES

208.    Plaintiff repeats and realleges all paragraphs above as though fully set forth herein.

209.    The overtime wage provisions outlined in the FLSA, 29 USC §§ 201 *et seq.*, and the supporting federal regulations apply to Defendants and protect Plaintiff.

210.    Defendants, in violation of 29 USC § 207(a)(1), failed to pay Plaintiff overtime compensation at a rate of one and one-half times the regular rate of pay for each hour worked more than forty hours in a workweek.

211.    Defendant failed to pay Plaintiff overtime compensation within 29 USC § 255(a).

212.    As a result of Defendant's willful violations of the FLSA, Plaintiff has suffered damages by being denied overtime compensation in amounts to be determined at trial, and is entitled to a recovery to such amounts, liquidated damages, pre-judgment interest, attorneys' fees, and costs, and other compensation according to 29 USC §§ 201 *et seq.*

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

a.  Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b.  Punitive damages;

c.  Attorney fees, pre-and post-judgment interest, and cost of suit;

d.  Such other relief as the Court may deem just and appropriate under the circumstances.

### TENTH CAUSE OF ACTION
### VIOLATION OF THE OVERTIME PROVISIONS
### OF THE NEW YORK STATE LABOR LAW

213.    Plaintiff repeats all paragraphs above as though fully set forth herein.

214.    Defendants, in violation of NY Lab.  Law § 190 et seq. and supporting regulations of the New York State Department of Labor failed to pay Plaintiff overtime compensation at one and one-half times the regular pay rate for each hour worked more than forty (40) hours in a workweek.

215.    Defendant's failure to pay Plaintiff overtime compensation was willful within the meaning of NY Lab.  Law § 663.

216.    Plaintiff is entitled to recover from Defendants his unpaid overtime wages, liquidated damages as provided for by the NYLL, reasonable attorneys' fees and costs, and pre-judgment and post-judgment interest.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

        a.    Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

        b.    Punitive damages;

        c.    Attorney fees, pre-and post-judgment interest, and cost of suit;

        d.    Such other relief as the Court may deem just and appropriate under the circumstances.

### ELEVENTH CAUSE OF ACTION
### VIOLATION OF THE TIMELY PAYMENT PROVISIONS
### OF THE NEW YORK LABOR LAW

217.    Plaintiff repeats all paragraphs above as though set forth fully herein

218.    Defendants did not pay Plaintiff every week in violation of NYLL § 191.

219.    Defendants are liable to Plaintiff in an amount to be determined at trial.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

a. Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b. Punitive damages;

c. Attorney fees, pre-and post-judgment interest, and cost of suit;

d. Such other relief as the Court may deem just and appropriate under the circumstances.

## TWELFTH CAUSE OF ACTION
### VIOLATION OF THE NOTICE AND RECORDKEEPING REQUIREMENTS OF THE NEW YORK LABOR LAW

220.    Plaintiff repeats all paragraphs above as though fully set forth herein.

221.    Defendants failed to provide Plaintiff with a written notice, in English, containing: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular payday designated by the employer; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; and tighten telephone number of the employer, as required by NYLL § 195(1).

222.    Plaintiff is damaged in an amount to be determined at trial.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

a. Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b. Punitive damages;

c. Attorney fees, pre-and post-judgment interest, and cost of suit;

d. Such other relief as the Court may deem just and appropriate under the circumstances.

## THIRTEENTH CAUSE OF ACTION
## VIOLATION OF THE WAGE STATEMENT PROVISIONS
## OF THE NEW YORK LABOR LAW

223.    Plaintiff repeats all paragraphs above as though fully set forth herein.

224.    With each payment of wages, Defendants failed to provide Plaintiff with an accurate statement listing each of the following: the dates of work covered by that payment of wages; the name of the employee; the name of the employer; address and phone number of the employer; rate or rates of pay as basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; the number of regular hours worked; and the number of overtime hours worked, as required by NYLL § 195(3).

225.    Due to Defendants' violation of NYLL, Article 6, § 195(3), Plaintiff is entitled to statutory penalties of two hundred fifty dollars for each workweek that Defendants failed to provide them with accurate wage statements or a total of five thousand dollars, and reasonable attorneys' fees and costs as provided for by NYLL, Article 6, § 198(1-d).

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

a.   Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b.   Punitive damages;

c.   Attorney fees, pre-and post-judgment interest, and cost of suit;

d.   Such other relief as the Court may deem just and appropriate under the circumstances.

### FOURTEENTH CAUSE OF ACTION
### VIOLATION OF NEW YORK LABOR LAW
### FAILURE TO PAY EARNED WAGES

226.     Plaintiff repeats all paragraphs above as though fully set forth herein.

227.     At all relevant times, Plaintiffs are employed by Defendants within the meaning of New York Labor Law §§ 2 and 651.

228.     At all relevant times, Defendants had a policy and practice of refusing to pay Plaintiff in full for some or all of the hours they worked.

229.     An employer who fails to pay wages shall be liable, in addition to the amount of any underpayments, for liquidated damages equal to twenty-five percent (25%) of the shortfall under NYLL §§ 190 *et seq.,* §§ 650 *et seq.,* and one hundred percent (100%) after April 9, 2011, under NY Wage Theft Prevention Act, and interest.

230.     Plaintiff is damaged in an amount to be determined at trial.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

  a.  Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

  b.  Punitive damages;

  c.  Attorney fees, pre-and post-judgment interest, and cost of suit;

  d.  Such other relief as the Court may deem just and appropriate under the circumstances.

### FIFTEENTH CAUSE OF ACTION
### Disparate Impact Discrimination
### Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000e et seq.

231.     Plaintiffs incorporate by reference the allegations in all preceding paragraphs.

232.     Plaintiff timely filed a charge with the EEOC and received Right to Sue letters, thereby exhausting his administrative remedies.

233.     Defendants' discrimination against employees due to their race and retaliation against them after they engaged in a protected activity (reporting supervisors'

discriminatory practices) has harmed and continues to harm Plaintiff and constitutes unlawful discrimination on the basis of race in violation of 42 U.S.C. §§ 2000e et seq.

234.     Defendant's policy and practice of denying equal access to corporate policies and procedures to African American males had and continue to have a disparate impact on African American individuals and are neither job related nor consistent with business necessity.

235.     Even if Defendant's policy and practice of denying equal access to corporate policies and procedures to African American males could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

236.     Defendant's conduct has caused and continues to cause, Plaintiff losses in earnings and other employment benefits.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

  a.  Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

  b.  Punitive damages;

  c.  Attorney fees, pre-and post-judgment interest, and cost of suit;

  d.  Such other relief as the Court may deem just and appropriate under the circumstances.

### SIXTEENTH CAUSE OF ACTION
**Disparate Impact Discrimination**
**New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 et seq.**

237.     Plaintiff incorporates by reference the allegations in all preceding paragraphs.

238.     Plaintiff timely filed his EEOC charge, received a Right to Sue letter, and thus exhausted his administrative remedies.

239.     Defendants' discrimination against employees due to their race and retaliation against them after they engaged in a protected activity (reporting supervisors' discriminatory practices) has harmed and continues to harm Plaintiff and constitutes unlawful discrimination on the basis of race in violation of N.J.S.A. § 10:5-1 et seq.

240.     Defendant's policy and practice of denying equal access to corporate policies and procedures to African American males had and continue to have a disparate impact on African American individuals and are neither job related nor consistent with business necessity.

241.     Even if Defendant's policy and practice of denying equal access to corporate policies and procedures to African American males could be justified by business necessity, a less discriminatory alternative exists that would have equally served any legitimate purpose.

242.     Defendant's conduct has caused and continues to cause, Plaintiff losses in earnings and other employment benefits.

**WHEREFORE,** Plaintiff demands that judgment be entered against Defendants and seeks the following relief:

a.  Compensatory damages for loss of wages (backpay and front pay) and lost benefits, emotional distress damages, including, but not limited to, pain, suffering, stress, humiliation, and mental anguish;

b.  Punitive damages;

c.  Attorney fees, pre-and post-judgment interest, and cost of suit;

d.  Such other relief as the Court may deem just and appropriate under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally, as follows:

a.     For past, present, and future general damages in an amount to be determined at trial;

b.     For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;

c.     Any appropriate statutory damages;

d.      For costs of suit;

e.      For interest as allowed by law;

f.      For attorney's fees;

g.      The cause of action authorized by any appropriate punitive or exemplary damages against

Defendants;

h.      For such other and further relief as the Court may deem proper.

Date: November 11, 2022

Brooklyn, New York

*Tyrone A. Blackburn, Esq.*

Tyrone A. Blackburn, Esq.